**Joe Wallace PAGE, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

Nov. 7, 1958.

Thomas W. Hines, Bowling Green, for appellant.

Jo M. Ferguson, Atty. Gen., David B. Sebree, Asst. Atty. Gen., for appellee.

STEWART, Judge.

Joe Wallace Page and Frank Page, brothers, and Walter Stovall were jointly indicted for the crime of wilful murder of L. T. Wix. Joe Wallace Page was tried separately, found guilty of the offense of which he was charged and sentenced to life imprisonment.

He appeals, urging these grounds for reversal: (1) The indictment was duplicitous and the demurrer to it should have been sustained; (2) the verdict was not supported by the evidence; (3) the court failed to give the whole law of the case be-

cause it declined to instruct on (a) robbery or attempt at robbery, (b) armed robbery, (c) assault and battery, and (d) assault with intent to rob; and (4) the Commonwealth's attorney's argument to the jury was so highly inflammatory that it served to incite the jury to render an unjust decision.

Turning now to the first contention raised, the indictment in substance charged that appellant, Frank Page and Walter Stovall committed the offense of wilful murder of L. T. Wix "by choking him and strangling him with their hands or some other instrument * * * and by striking him and beating him and throwing or pushing or rolling or causing him to fall over a high bluff and cliff into a rock quarry * * *." It is maintained the language employed accused the persons named of participating in more than one crime.

Subsection 2 of Section 122 of the Criminal Code of Practice requires the indictment to contain a statement of the acts constituting the offense, in ordinary and concise language, and in such manner as to enable a person of common understanding to know what is intended, and with such degree of certainty as to permit the court to pronounce judgment on conviction according to the rights of the case.

It has been held that it is not a departure from the provisions of this subsection to aver in the indictment that the offense may have resulted from more than one type of acts. See Delk v. Commonwealth, 308 Ky. 579, 215 S.W.2d 109. Although only one crime may be charged against the accused, the indictment may set forth that the offense was perpetrated by different means, and may allege means in the alternative in the commission of the criminal act. See Carsons v. Commonwealth, 243 Ky. 1, 47 S.W.2d 997. When these principles are applied to the indictment under discussion it is apparent it was not demurrable. Appellant was accused of only one crime, willful murder, but it was

asserted he may have accomplished the unlawful deed in one of several ways.

It is next insisted the trial judge should have peremptorily instructed the jury to find appellant not guilty because it is claimed his conviction was not sustained by the evidence. A summary of the proof introduced by the Commonwealth discloses that on the night of March 14, 1956, L. T. Wix, a white section hand in the employ of the Louisville & Nashville Railroad Company, came to Bowling Green from Franklin in the company of a Negro named Elwood Bridges. Shortly after their arrival they met up with three other Negroes, namely, appellant, his brother Frank Page, and Frank Stovall. It was soon ascertained that Wix had around one hundred dollars in cash on his person and the idea was concocted by appellant to rob him. This scheme was readily agreed to by the others when communicated to them.

After these five persons had visited various bars and had drunk a quantity of beer, wine and whisky, all of them got in Wix' car and proceeded out the Barren River Road. After traveling some three or four miles on this highway, they made a left turn onto another road and traversed this until they came to a point near what is known as the Gary Brothers quarry, which is located below a high bluff. Here they stopped the car and got out of it. This particular portion of the quarry has been abandoned. The road passes some twelve feet from the ledge of the bluff, and the distance from the top of the ledge to the floor of the quarry was measured at eighty-three feet and six inches.

Walter Stovall gave a statement as to what occurred at the quarry after they unloaded from Wix' automobile. According to Stovall, appellant, after some words between him and Wix, started advancing toward him in a menacing manner, and Wix kept backing away, pleading to be left alone. Soon appellant caught up with Wix. Stovall's statement gives these details as to what followed: "Him and Joe scuffled.

Joe called Frank. 'Come up here, Frank', he said. Frank came up there and Wix got loose from Joe by the time he got there and ran up the road a little piece farther. When I got to where I could see, Frank had him by the legs and Joe had him around the body. They dropped Wix to the ground and Joe got straddle of his back and wrapped his arms around his back and squeezed for a few minutes. Then, when he was through and Wix was laying there, Joe said: 'Let's go.' Joe had already got his pocket book when they first started scuffling. Now, he put it back in his pocket. Joe had taken the money out of it. We started away and Joe said: 'We can't leave him laying there like that.' We all went back to the man and Frank got hold of his feet and Joe his head and I got his middleways and we carried him to the edge of the rock quarry."

Appellant gave three versions in writing as to what happened concerning Wix. The first statement was made on March 27, 1956, to W. D. Calvert, a detective attached to the Kentucky State Police. In this statement, appellant denied having any knowledge of the death of Wix and said he had left him at the colored American Legion in Bowling Green on the night in question and had returned to his home. Later, that same day, appellant gave this same officer a supplemental statement, saying at the outset: "I did not tell the truth in the statement I gave earlier today."

He admitted in this second written account that he, Elwood Bridges, Frank Page and Walter Stovall went out to the quarry with Wix. There they all got out of the automobile. According to appellant, the trouble that took place occurred solely between Wix and Stovall. Appellant claimed Wix cursed Stovall and the latter started after him with a knife in his hand. Appellant stated: "Wix looked like he was running sideways as he ran away. I guess Wix had run about 25 feet when he went over that place." Appellant said they left soon after Wix had fallen from the ledge without making any investigation about his fate. He declared he came back to Bowling Green next morning "and went out there and looked down that bluff and saw the man." According to him, he went to see Elwood Bridges later in the week and they agreed they should not be seen talking together in the future.

On March 30, 1956, appellant made a third statement, as he wrote, "to correct errors in my earlier statement given before this." In this account of what took place at the quarry, appellant admitted he, his brother Frank Page, and Walter Stovall planned to rob Wix on the occasion of the latter's decease. He stuck to his previous story as to how Wix met his death, namely, that Stovall pursued Wix with a knife and he, Wix, inadvertently ran off the ledge of the quarry. Appellant then added these new facts to his statement: He said he burned his shoes several days later, and he took off two of the tires on his car. In this connection, he said: "I didn't take them off on account of this," that is, because of what happened to Wix. He also stated that those at the quarry departed for Bowling Green shortly after Wix went over the ledge. Then, after visiting with appellant's girl friend in that city for a period of time not specified, they took Wix' car back and abandoned it near the scene of the crime on the Barren River Road. Appellant remarked: "We will push the car out there and maybe if this man gets out of the hole he won't have me arrested."

Appellant took the stand in his own behalf at his trial. He stated he went along with Wix, Frank Page, Walter Stovall and Elwood Bridges at the time Wix was killed. His testimony was, for the most part, a long rambling narrative about an argument and a fight that ensued between Wix and Stovall. He still maintained Wix lost his life when he accidently fell over the ledge. Frank Page's evidence substantially corroborated appellant's testimony.

Wix' body was not discovered in the quarry until March 26, 1956. An autopsy was performed on the remains by Dr. W.

A. Clark at a hospital in Louisville on or about this date. He testified Wix had a fractured skull, a broken left arm, eight ribs on the left side broken and caved in, multiple fractures of his pelvis, a broken left thigh, fractures of both shoulder joints, two front teeth missing and abrasions or scratches all over his body. Dr. Clark also made this statement: "The other findings were around his trachea or around the throat. He had hemmorhage or blood in the tissue, not separate, which would indicate that there had certainly been some bruise in the neck or throat at a time when this individual was living and we were able to tell by looking at the microscopic slides of the blood in the little arteries and veins as to whether it was actually bruised or whether it was already there."

The lower court submitted an instruction in conformity with Section 240 of the Criminal Code of Practice which told the jury they could not convict appellant on any confession he made out of court unless such acknowledgment pertaining to criminal guilt was corroborated by other evidence which tended to connect him with the commission of the offense of which he was accused. It is quite apparent there was other evidence of probative value, in addition to the statements mentioned above, which would uphold the jury's conviction. Appellant's own testimony voluntarily offered as a witness, coupled with Dr. Clark's evidence, would take this case to the jury and sustain the verdict rendered by them. Appellant placed himself at the scene of the crime at the time of its commission and made certain statements that appear false in respect to the occurrences there. It will be recalled Dr. Clark's proof was to the effect that Wix may have met his doom prior to his fall, since the marks on his throat indicated he may have been choked to death. The authorities relied upon by appellant to substantiate his claim that he should have had a directed verdict bear no relation to the case at hand.

■ The third ground urged for reversal is without merit. The indictment charged appellant with but one offense, wilful murder, and it is axiomatic that only instructions based upon this offense and the lesser degrees thereof should have been given.

■ The last contention is that the commonwealth's attorney made certain remarks to the jury in his closing argument that cannot be reasonably deduced from the evidence. We have read over this officer's speech in its entirety from which certain language was excerpted that was objected to by appellant. We believe each of these statements has a logical basis on the facts that were brought out at the trial. Furthermore, we cannot share appellant's conviction that they were of an inflammatory nature. Nor were they prejudicial in their effect.

Wherefore, the judgment is affirmed.